Mary Miller, appellee, v. Jane Worth, appellant.

Filed April 8, 1909.   No. 16,322.

1. **Deeds: Cancelation: Undue Influence.** In equity a warranty deed may be canceled on proof justifying findings that it was a gift from grantor to her sister; that grantor was physically and mentally weak, and that grantee was strong both mentally and physically; that, in addition to their sisterhood, relations of trust and confidence existed between them in business affairs, grantor relying on her sister; that the deed deprived grantor's children of her property, and that these and other circumstances warrant the conclusion that the deed was procured by undue influence of grantee.

2. ——: **Undue Influence: Ratification.** A deed procured by undue influence as a gift from a person who is weak mentally cannot be sustained on the ground of ratification, where a duly appointed guardian is insisting on a cancelation, and the evidence shows that grantee's influence over grantor has continued without interruption and that the latter has not improved mentally.

Appeal from the district court for Cass county: Harvey D. Travis, Judge. *Affirmed.*

*Matthew Gering,* for appellant.

*Byron Clark* and *W. A. Robertson, contra.*

Rose, J.

This is a suit to cancel a warranty deed to 80 acres of land in Cass county and two lots in the village of Murray. Mary Miller, plaintiff, was grantor, and her only sister, Jane Worth, defendant, was grantee. The conveyance included practically all of the property owned by plaintiff, but she reserved a life estate. She lived in a house on the lots and received an annual income of $250 from the land. The suit was instituted by her next friend, John Murray, Jr. Later David J. Pitman was appointed guardian and substituted for her next friend. The trial court canceled the deed, and defendant has appealed.

The grounds on which plaintiff demanded relief were mental incompetency of grantor and undue influence of grantee. The pleadings put these facts in issue and the evidence was directed thereto. The question presented is: Under the evidence, should the deed be canceled? The testimony is far too voluminous for extended analysis in an opinion of reasonable length. It has all been examined with care, however, for the purpose of reaching the proper conclusion.

Plaintiff was 62 years of age at the time of the trial, and was then living with her second husband, Chris. Miller. Her only children, three daughters, were the issue of a former marriage with George Young. After the children grew up, their parents were divorced. Two of the daughters were married and had homes of their own. The other daughter lived with her father, who remarried and moved from his home in Cass county to Oklahoma. To meet plaintiff's proofs, defendant adduced testimony tending to show: After plaintiff was separated from her first husband she repeatedly told neighbors, friends and acquaintances that her daughters had taken the side of their father and had mistreated, neglected and abandoned her. She did not intend that they should have her property. Her sister had always stood by her and had treated her kindly and she intended to

give her property to her sister. To this end she had made three wills, but, fearing a contest, had voluntarily deeded her real estate to defendant, who had never done anything to turn plaintiff against her daughters or asked for the property. Many witnesses who had observed the conduct of plaintiff during recent years testified they saw nothing unusual in her behavior and expressed the opinion she was mentally competent to make the deed.

On the other hand, there is oral or documentary proof tending to show by direct statement or proper inference the following: Defendant lived on a farm near Pender, in Thurston county. Plaintiff went to visit her there in February, 1905, and returned to Murray in July of the same year. In the meantime plaintiff had been very ill. When she left home she was a large, corpulent woman. When she returned she was weak and emaciated and never recovered her health. According to her physicians, she had diabetes and was suffering from general neurasthenia. Protracted anxiety, grief, worry and excitement are disclosed by the evidence and are among the recognized causes of neurasthenia. Symptoms of this affliction, such as physical weakness, insomnia, loss of power to concentrate the mind, and fear, are also shown by the evidence, independently of the testimony of experts. A physician who treated her in 1905 expressed the opinion that she was incapable of attending to business. The deed was executed November 9, 1905. Plaintiff had previously confessed to her sister a belief in fortune-telling and they had gone together to have their fortunes told. When talking to her sister, defendant said a fortune-teller had told her she was going to get some property, but plaintiff's prospect was less hopeful, for she was cautioned that some one was trying to beat her out of her property; that he wanted it to invest, and if he got it he would beat her out of it. After plaintiff returned from Pender she repeatedly told neighbors and acquaintances of her experiences with fortune-tellers; that she believed in them, and that they had helped her. Some-

times when alone in her own house she would become boisterous and use violent language. At other times she would stand in her yard for a long time apparently distracted. She inherited from her father a violent temper. She denounced her children as undutiful, though there is nothing in the record to justify her antipathy for them. As early as July 25, 1901, defendant wrote to one of plaintiff's daughters a letter containing the statement: "Your ma's mind wasn't just right when she was here." It may fairly be inferred from the testimony that the attorney who drew the deed suspected at the time that "the old lady was off a little," as he expressed it. It is at least questionable whether the life estate reserved by plaintiff in her deed would have been sufficient for her support during protracted periods of illness.

While plaintiff was struggling with her unhappy lot and laboring under the infirmities described, her sister was an exceptionally vigorous, strong-minded woman. She transacted her own business. She attended sales, bought stock, accompanied shipments to the stock-yards, and sold her own cattle. On one occasion she addressed the supreme court in her own behalf in a case wherein she was a party. Plaintiff looked to her for advice, expressed herself as having great confidence in her, and frequently said the only relative she could depend upon was her sister. At Pender they frequently talked together about plaintiff's property. Plaintiff testified she asked her for it. Defendant admitted on cross-examination that plaintiff relied upon her when she was sick, and that she sometimes appealed to her for advice in business matters and that it was given. Plaintiff did not confide in her daughters when executing the wills and the deed, and in this regard she evidently respected the wishes of defendant. With the relations, circumstances and conditions in the situation described, defendant appeared at the home of plaintiff in Murray at 1 o'clock in the morning, November 9, 1905. The same morning at 9 o'clock H. Wade Gillis, with a supply of blank deeds,

also appeared at the request of defendant. He was un-known to plaintiff, and his office was at Tekamah in another county. He drew the deed in controversy at plain-tiff's home, and promptly secured the services of a no-tary who took the acknowledgment there. Plaintiff was at the time weak, nervous and agitated. She signed her name "Mary Ung," instead of "Mary Young." At 1 o'clock P. M., the same day, the deed was recorded at Plattsmouth. Gillis was defendant's attorney and re-ceived from her $25 for his services. He admitted on the witness-stand that he advised plaintiff to sign the deed. She did not have independent advice or counsel. The register of deeds immediately notified defendant at Pen-der of the error in grantor's signature. Defendant promptly returned to Murray, had the deed corrected, and went back to Pender on the first train.

The conveyance was a gift. The only consideration was correctly described in the deed as "love and affec-tion." Plaintiff was decrepit, physically weak and at least mentally infirm. Defendant was strong, both men-tally and physically. The evidence makes it clear that in business matters plaintiff looked to her sister for advice and relied upon her. In addition to their sisterhood, the relation between them was one of trust and confidence. It was defendant's accepted duty to advise her sister. Her obligation in that respect was the same, whether the relation of confidence grew out of a sense of sisterly af-fection or was officiously cultivated for mercenary ends. In either situation equity demands restitution for any abuse of confidence resulting in an undue advantage to defendant. Defendant was in a sensitive position when she accepted a gift which her attorney advised plaintiff to make. Haste and secrecy in so important a matter were not satisfactorily explained. Three wills had been made. Each new one increased the advantage of defendant, and the deed was more beneficial to her than any of the wills. The soothing influence of time and the approach of death did not restore the daughters to normal relations with

their mother. Three years after the deed was executed plaintiff and defendant went together to a bank in Platts-mouth, and plaintiff then made a deposit in the name of "Mary Miller or Jane Worth." The explanation of this transaction was that it would permit defendant to draw the money, "if anything happened" to plaintiff. This act of business sagacity scarcely originated with plaintiff. An officer of the bank testified that defendant at the time said: "The children are trying to get the money away from Mrs. Miller." When all the circumstances are con-sidered in connection with the relations of the parties and the mental and physical condition of plaintiff, there is convincing proof that the deed was procured by means of undue influence on the part of defendant. In this re-spect the finding here will be the same as that of the trial court.

Ratification by plaintiff is invoked to sustain the deed, but this position is wholly untenable. A duly appointed guardian insisted on a cancelation, and the evidence shows that defendant's influence over her sister continued, even after the guardian was appointed, and that plain-tiff's mental condition did not improve. The evidence justifies the decree below.

AFFIRMED.